**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 9 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

————————————————————

LINDA LOU ECKERT and TUXIE
EUGENE BALLARD III,

    Plaintiffs-Appellants,

v.

THE TOWN OF SILVERTHORNE,
GREG MORRISON, DAVID
PALACIOS, MARK SILAS AND
ERIC STREMEL,

    Defendants-Appellees.

No. 00-1030

(D. Colorado)

(D.C. No. 97-M-67)

————————————————————

**ORDER AND JUDGMENT** *

————————————————————

Before **EBEL**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**BRIMMER**, District Judge. **

————————————————————

---

\*     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

\*\*     The Honorable Clarence A. Brimmer, United States District Judge
for the District of Wyoming, sitting by designation.

Plaintiff-Appellants Linda Lou Eckert and Tuxie Eugene Ballard III appeal the district court's December 17, 1999 Order granting summary judgment to Defendant-Appellees . Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

**Background**

Areas of factual dispute are noted below, although the underlying facts are construed in favor of the non-movant Appellants for the purposes of this appeal. On October 4, 1994 in Silverthorne, Colorado police officers responded to a 911 call from Tuxie Ballard ("Ballard"), the father of Plaintiff-Appellant Tuxie Eugene Ballard III ("Tuxie"). Ballard claimed he had been assaulted by Plaintiff-Appellant Linda Eckert ("Eckert"), the woman with whom he lived. Defendants Mark Silas ("Silas") and Eric Stremel ("Stremel"), officers of the Silverthorne Police Deparment ("SPD"), arrived at the residence to find Ballard in the front yard, holding a cordless telephone and bleeding from the mouth. Ballard told the officers he had been hit by Eckert, and did not strike back because he had been charged with domestic assault on two previous occasions.

Stremel interviewed Eckert, who claimed Ballard had hit her, then called the police before she could. Stremel noticed a wound on Eckert's hand and asked her if she hit Ballard. Eckert said she did not know Ballard was injured, but suggested it might have been the result of Eckert trying to defend herself. Eckert

showed Stremel injuries allegedly caused in earlier fights with Ballard, including red marks on her arms. Eckert told the officers of guns and drugs in the house, which she claimed belonged to Ballard. Officers confiscated marijuana, a water pipe, a 9mm pistol and a sawed-off shotgun.

Appellants contend Ballard caused his own injuries by striking himself in the face with a rock before police arrived. According to Appellants, young Tuxie witnessed his father hitting himself with the rock, but Officers Silas and Stremel allegedly ignored the child's attempts to show them the bloody rock. The officers photographed Ballard's mouth and Eckert's hands.

Silas and Stremel arrested Eckert for misdemeanor harassment, leaving Tuxie with Ballard. A victim's advocate, Kim O'Brien, spoke with Ballard and Tuxie to determine if they needed any assistance. Tuxie indicated he was willing to stay with his father. Eckert posted $1000.00 bond, and was released later that day. She was escorted back to her home by SPD officers. Eckert alleges the officers prevented her from removing personal property from the house. Eckert then went to a domestic violence safehouse.

On October 5, 1994, Eckert met with Kim O'Brien, and Assistant District Attorney Todd Barson ("Barson"). Eckert alleges that after she attempted to tell her version of events, Barson told her that charges would be dropped if Eckert arranged to leave the state. The district attorney suggested Eckert return to the

house with a SPD officer for the purpose of collecting evidence of Ballard's drug activity. She was re-arrested at her home by other SPD officers because her original bond had been revoked.

Eckert subsequently provided copies of a previous protective order from Texas, a copy of an indictment against Ballard from a previous domestic assault in Texas, and other information suggesting Ballard had committed violent acts on previous occasions. According to Eckert, Silverthorne Police Chief Morrison and Police Sergeant Palacios discounted her version of events, refused to arrest Ballard, and tried to convince her to plead guilty to the pending domestic violence charge.

Tuxie lived with Ballard for the next three months. Charges against Linda Eckert were dismissed for lack of evidence on December 20, 1994. Eckert claims Ballard continued to harass and threaten her and Tuxie. Eckert alleges Ballard broke a windshield and mirror on one truck owned by Eckert, destroyed the engine on another, and was stealing Eckert's personal property from her office and a storage locker. Eckert reported these incidents to Officer Silas, who instructed her to submit her complaints in writing. After submitting her complaints, Eckert claims District Attorney Barson instructed the police not to act on them, because he believed Eckert and Ballard were married and in the process of obtaining a divorce.

Eckert obtained a Temporary Restraining Order against Ballard on January 25, 1995, and a permanent injunction on February 6, 1995. Appellants contend the SPD refused to act on Eckert's complaints, even after a judge's ruling that she and Ballard were not legally married. Eckert and Tuxie have since left Summit County, Colorado.

Eckert contends she was wrongfully taken into custody, and this was the result of discriminatory treatment of women by the SPD in domestic violence situations. She further alleges that the police failed to adequately respond to her later complaints of threats, harassment, and property damage committed by Ballard.

Eckert brought claims under 28 U.S.C. § 1983 and Colorado state law for failure to train, unlawful seizure of Eckert, deprivation of freedom of intimate association, deprivation of liberty and property, and equal protection. The district court granted Defendants' motion for summary judgment finding no constitutional violation. The court determined there was no reckless conduct on the part of the SPD, and that the officers had probable cause to effectuate an arrest. The district court noted that Eckert could not have been denied intimate association by the Defendants because the bond conditions initially preventing her from seeing her son were set by a county judge, not the police department. The district court also held no "special relationship" was created when Eckert was taken into custody,

and refused to consider statistical evidence of domestic violence arrests provided by Eckert to support her equal protection claim. Because the district court held no constitutional violation occurred, it did not address the contention that the SPD failed to train its officers. Common law claims for negligence, negligence per se and outrageous conduct were rejected as time-barred. The Plaintiff-Appellants have appealed on the grounds of equal protection, substantive due process and the failure to train.

## Standard of Review

The standard for reviewing issuance of summary judgment is de novo, and identical to that applied by the district court. Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party." Adarand Constructors, Inc. v. Slater, 228 F.3d 1147, 1161 (10th Cir. 2000).

## Discussion

**A. Equal Protection**

Appellants argue the district court failed in its analysis of their equal

protection claims. First, according to Appellants, the district court erred in granting summary judgment on Appellants' claim that Eckert's arrest constituted an equal protection violation, and the failure of the SPD to act in response to Eckert's subsequent complaints constituted a pattern of discriminatory conduct likewise prohibited under the equal protection clause. Second, Appellants contend the district court erred in rejecting statistical evidence proffered by Eckert to show a pattern of discriminatory treatment of domestic violence victims by the SPD.

The Fourteenth Amendment provides no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, §1. There is no general constitutional right to police protection, but if the state provides police protection it is prohibited from irrational discrimination in providing such protection. Watson v. City of Kansas City, 857 F.2d 690, 694 (10th Cir. 1988). To comport with the Equal Protection Clause, the law cannot be administered "with an evil eye and an unequal hand." Yick Wo v. Hopkins, 118 U.S. 356, 373 (1886).

To maintain an equal protection claim, a plaintiff has the burden of showing discriminatory intent, and although "[t]he discriminatory purpose need not be the only purpose, [] it must be a motivating factor in the decision." Villanueva v. Carere, 85 F.3d 481, 485 (10th Cir. 1996) (quoting Arlington

Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265-66 (1977)). In cases such as this, where the complaint alleges a custom or policy of unequal police protection of domestic violence victims,

> to survive summary judgment, the plaintiff must go beyond her pleadings and show that she has evidence of specific facts that demonstrate that it is the policy or custom of the defendants to provide less police protection to victims of domestic assault than to other assault victims. She [1] must also provide evidence that discrimination was a motivating factor for the defendants and that she was injured by operation of the policy or custom.

Watson, 857 F.2d at 694.

## 1.    Eckert's Arrest and Pattern of Discrimination

Appellants contend the decision to arrest Eckert rather than Ballard was a miscarriage of Colorado's mandatory arrest law, Colo. Rev. Stat. 18-6-803.6 (1)(1994). Under the law, when an officer determines there is probable cause of domestic violence, "the officer shall, without undue delay, arrest the person suspected of its commission." Id. The law also establishes standards to be

---

[1]    In Watson, we recognized that equal protection claims arising from domestic violence situations may implicate a plaintiff's membership in two different classes: victims of domestic violence and women. Watson, 857 F.2d at 696. Although women are the victims in a vast majority of domestic violence cases, the two classes are not necessarily coterminous since it is also possible for a man to be a victim of domestic violence. See Ricketts v. City of Columbia, 36 F.3d 775, 781 (8th Cir. 1994). In Watson, we restored the plaintiff's claim of discriminatory treatment based on her status as a victim of domestic violence, but rejected her claim of discriminatory treatment based on her gender. Watson, 857 F.2d at 696. Although Appellants here suggest SPD's enforcement customs may disproportionately affect women, they have not sufficiently alleged invidious gender-based discrimination for the purpose of this appeal.

considered by an arresting officer:

> (a) Any prior complaints of domestic violence;
> (b) The relative severity of the injuries inflicted on each person;
> (c) The likelihood of future injury to each person; and
> (d) The possibility that one of the persons acted in self-defense

Colo. Rev. Stat. 18-6-803.6 (2).

Appellants contend the arrest of Eckert was erroneous considering the circumstances at the time of the officers' arrival:  Ballard admitted to prior arrests for domestic violence; Eckert claimed Ballard had injured her earlier that morning and on previous occasions; restraining orders had been issued against Ballard on prior occasions; and Eckert claimed to have acted in self-defense.  The officers' failure to arrest Ballard worked to deny Eckert and her son the equal protection afforded by the Colorado mandatory arrest statute, according to Appellants.

However, this is not a case where police failed to enforce the law-- suspecting Eckert of domestic violence, they took her into custody. [2]  Therefore, the question arises whether the police had probable cause to arrest Eckert.  An arresting officer's determination of probable cause is reviewed _de novo_ by an appellate court.  Ornelas v. United States, 517 U.S. 690, 697 (1996).  Here, although the evidence is far from unequivocal, we agree with the district court's

---

[2]    Appellants stop short of arguing that the mandatory arrest law requires officers always to arrest men rather than women in domestic violence situations.  Of course, such a statute would not survive even the most lenient equal protection analysis.

assessment that the SPD had probable cause to arrest Eckert: all three officers at the scene noticed Ballard's bloody mouth and shirt, as well as abrasions on Eckert's right hand. Ballard stated Eckert had punched him, a conclusion not disputed by Eckert at the time. "I said if Tuxie got hit, then I must have hit him." (Depo. of Linda Eckert, App. to Appellants' Br. at 360.)

Colorado law does not assign any particular weight or hierarchy to the factors to be considered by arresting officers. "Probable cause to arrest exists when officers have knowledge of facts that would warrant a [person] of reasonable caution in the belief that an offense has been or is being committed." United States v. Bruce, 78 F.3d 1506, 1508 (10th Cir. 1996) (citation and quotation omitted). Despite the evidence cited by Appellants, Officers Stremel, Silas and Sergeant Palacios were justified in believing Eckert had assaulted Ballard. Colorado law mandates action in domestic violence situations, and such action was taken. Appellants cannot support an equal protection claim that Defendants customarily discriminate against domestic violence victims as a class based on the events of October 4, 1994.

Nor can such a claim be maintained based on Eckert's subsequent dealings with the SPD. Eckert contends that over eight months following her arrest, she and her son were subjected to threats and property damage at the hands of Ballard, and her complaints were "stalled, put off, or just plain ignored" by the

SPD. (Appellants' Br. at 18.)

Eckert argues Appellees were required to act on her complaints, and their failure to do so worked to deprive her of equal protection. Eckert points the state statute which, in addition to physical force and threats, defines domestic violence as "any other crime against a person or against property . . . when used as a method of coercion, control, punishment, intimidation or revenge." Colo. Rev. Stat. § 18-6-800.3(1). In such cases, under the statute "[w]hen a peace officer determines that there is probable cause to believe that a crime or offense involving domestic violence, as defined in section 18-6-800.3(1), has been committed, the officer shall, without undue delay, arrest the person suspected of its commission." Colo. Rev. Stat. § 18-6-803.6 (1). The Colorado mandatory arrest law applies with equal force to such crimes, according to Appellants, and therefore the SPD's failure to arrest Ballard based on Eckert's complaints was an unconstitutional deprivation.

Similarly, Appellants contend the SPD was constitutionally compelled to arrest Ballard based on Eckert's claims that he violated the temporary restraining order she obtained on January 25, 1995, and the permanent restraining order she received on February 6, 1995. "A peace officer shall arrest, or, if an arrest would be impractical under the circumstances, seek a warrant for the arrest of a restrained person when the peace officer has information amounting to probable

cause that (I) The restrained person has violated or attempted to violate any provision of a restraining order." Colo. Rev. Stat. § 18-6-803.5 (3)(b).

Both of these mandatory arrest provisions require as a prerequisite that an officer establish probable cause. Appellants' cursory assertions to the contrary, examination of the circumstances reveals the decision not to arrest Ballard was well within the officers' discretion. Part of an officer's assessment of the totality of circumstances in a probable cause determination is the credibility of witnesses. Cf. Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1259 (10 th Cir. 1998). Eckert's allegations, by themselves, were insufficient to mandate an arrest, and based on previous events and an assessment of Eckert's veracity, the SPD officers decided probable cause was not present. See Losinski v. County of Trempealeau, 946 F.2d 544, 553 (7 th Cir. 1991) (holding Wisconsin mandatory arrest law did not remove officer's discretion in first determining probable cause). The SPD's assessment was ratified by the district attorney's decision not to pursue charges against Ballard.

2. **Statistical Evidence**

In support of their equal protection claims, Appellants offered statistical compilations as evidence of a pattern of discriminatory conduct on the part of Silverthorne police. The statistics were culled from SPD records dated from 1992 through 1995. Appellants' expert, Ann O'Dell, reviewed and compared police

reports involving 132 domestic assaults and 122 "regular" assaults. (Appellants' App. at 337.) According to O'Dell's findings, <u>inter alia</u>, Silverthorne police investigating regular assaults were more likely to conduct interviews with third parties (46% of "regular" cases compared to 27% of domestic violence calls) and non-domestic property crimes (63% to 50%) (Appellants' App. at 337-38.) Arrests rates were higher for non-domestic property claims (92%) than domestic property complaints (8%), according to O'Dell's findings. (<u>Id.</u>) O'Dell also concluded that arrests of women were generally higher in Silverthorne than the national average. (<u>Id.</u>) O'Dell concluded that "Silverthorne officers conduct superficial investigations that result in the over-arrest of women." (Appellants' App. 338.) O'Dell also termed the training received by SPD officers "inadequate" and attributed Eckert's October 4, 1994 arrest to deficiencies in domestic violence education at the SPD. (Appellants' App. 331, 339.)

Appellants' statistical evidence was rejected as unreliable by the district court. According to the lower court, the 1994 adoption of a mandatory arrest rule in domestic violence cases rendered O'Dell's statistics unreliable. The court also noted O'Dell's findings had not been tested for reliability and would not be admissible, ostensibly pursuant to Fed. R. Evid. 702. The relevancy of evidence is generally a determination committed to the discretion of the trial court. <u>United States v. Flanagan</u>, 34 F.3d 949, 952 (10th Cir. 1994).

This Court has allowed the use of statistical evidence to oppose summary judgment where plaintiffs allege unequal police protection for victims of domestic violence. Watson, 857 F.2d at 695. Such a use of statistical evidence has also been noted with approval by other circuits. See Hynson By and Through Hynson v. City of Chester, 864 F.2d 1026, 1031 (3 rd Cir. 1988); Shipp v. McMahon, 234 F.3d 907, 914 (5 th Cir. 2000); Ricketts v. City of Columbia, 36 F.3d 775, 781 (8 th Cir. 1994).

However, statistical evidence is not the talisman Appellants' brief would suggest [3]. Our decision in Watson itself recognized that "statistics may be so defective as to be inadmissible as irrelevant." Watson, 857 F.2d at 695; see also Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1315 n. 9 (10 th Cir. 1999); Cf. McCleskey v. Kemp, 481 U.S. 279, 297 (1987) (rejecting statistical evidence of disparate application of the death penalty). "Statistical evidence offered by a party must 'cross a threshold of reliability before it can establish even a prima facie case of disparate (treatment).'" Martinez v. Wyoming Dept. of Family Servs., 218 F.3d 1133, 1138 (10 th Cir. 2000) (citation and quotation omitted)

---

[3] Appellants disingenuously cite the district court opinion on remand in Hynson, 731 F.Supp. 1240-41 (E.D.Pa. 1990), for the proposition that "statistics alone pass muster and withstand summary judgment." (Appellant's Br. at 22.) Such was not the Third Circuit's holding in Hynson, 864 F.2d at 1030-31, nor is it the rule applied by this Court. The existence of a discriminatory police custom or policy requires consideration of "all of the plaintiff's evidence." Watson, 857 F.2d at 696.

(discussing statistical evidence in the context of a Title VII claim).

The district court held the adoption of Colorado's mandatory arrest law in 1994 compromised the integrity of O'Dell's domestic violence statistics, and we are inclined to agree. In Watson, comparisons of arrest rates were used to establish a question of material fact regarding police treatment of domestic violence victims. Watson, 857 F.2d at 695. We rejected the contention of the defendants that the variable of probable cause from case to case invalidated the arrest statistics. Id. To the contrary, we held the statistics offered in Watson retained some merit, since "the determination of whether or not probable cause exists and the decision to arrest may present essentially the same issue. So, the failure to account for probable cause does not necessarily undermine the probative value of the statistics." Id.

Here, the disputed statistical evidence is of dubious value, since the arresting officer's discretion has been statutorily altered in cases occurring after July 1994. We need not speculate on what specific effects this difference might have on the final arrest statistics. Whereas we held the Watson statistics could not be undermined to the extent they were all equally subject to the arresting officers' probable cause determination, equating arrests made under two different calculi of police decisionmaking fundamentally undercuts the soundness of Appellants' numbers. The district court also noted that its concerns regarding

O'Dell's statistics were not assuaged by the absence of testing.

While a "custom and policy of not providing assistance to victims of abuse by spouses in the same manner as other victims of assault deprived her of the equal protection of laws guaranteed by the fourteenth amendment," Watson, 857 F.2d at 694, such was not the case here. The SPD responded to Eckert's call, and while she may believe they arrested the wrong person, that is insufficient to support Appellants' contentions. Furthermore, Appellants' argument is predicated on the belief that women are always the victims of domestic violence. An equal protection claim, without more, cannot rest on such a spurious premise.

**B.      Substantive Due Process**

Appellants argue that the acts and omissions of the Appellees violated constitutional protections of substantive due process. Generally, the Due Process clause of the Constitution does not impose an affirmative duty on government personnel to aid citizens. DeShaney v. Winnebago County Dept. of Soc. Servs., 489 U.S. 189, 196 (1989). However, there are two recognized exceptions to this rule: First, where a governmental actor creates the danger to which a citizen is exposed; and second, where a special custodial relationship is created between state and citizen. Armijo v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1260 (10th Cir. 1998) Appellants assert claims under both of these theories.

**1.      Danger Creation**

Appellants first claim they were denied substantive due process because they were exposed to a danger created by Silverthorne officials. Appellants allege the Defendants recklessly endangered Eckert and her son by failing to arrest Ballard or investigate Eckert's later complaints. Under this theory of due process, a state actor who creates a substantial risk and then fails to protect a citizen against that risk "is as much an active tortfeasor as if [they] had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982) (quoted in Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995)).

> A prima facie claim of danger creation requires the plaintiff show:
>
> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscious shocking.

Armijo, 159 F.3d at 1262-63. With regard to the first factor, Appellants obviously do not contend the SPD created Ballard's menace. But neither can they show that the Appellees' acts or failure to act increased the vulnerability of Eckert or her son.

Construing all inferences in Appellants' favor, Ballard plainly presented a threat, but Appellees' reaction to that threat does not implicate substantive due process. "The danger creation theory [] focuses on the affirmative actions of the

state in placing the plaintiff in harm's way.  Plaintiffs cannot rely on Defendants failure to intervene."   Currier v. Doran , 242 F.3d 905, 919 (10 th Cir. 2001).  There is no indication that the acts of the Appellees in any way magnified Appellants' exposure to harm.

Likewise, Appellants have not shown Appellees Morrison, Palacios, Silas or Stremel acted recklessly.  For a claim of recklessness to be cognizable under § 1983, the state actor must manifest either "(1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm."   Uhlrig , 64 F.3d at 573.   The Due Process clause does not immunize citizens "against incorrect or ill-advised [government] decisions."   Seamons v. Snow , 84 F.3d 1226, 1236 (10 th Cir. 1996) (quoting  Collins v. City of Harker Heights  , 503 U.S. 115, 120 (1992)).

The first type of recklessness conforms to the outlines of traditional intentional torts, while the second type is defined as "when a state actor 'was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.'"   Uhlrig , 64 F.3d at 574 (quoting Medina v. City and Cty. of Denver   , 960 F.2d 1493, 1496 (10 th Cir. 1992). Appellants claim the district court did not apply the proper standard on summary judgment, but they fail to make even a minimal showing of intentional action on the part of the Appellees.

Similarly, Appellants do not meet the requirement that government action must be "conscience-shocking" to support a danger creation claim. In weighing whether action truly shocks the conscience, the Court considers "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier v. Doran, 242 F.3d at 920. These factors counsel that application of danger creation as a basis for § 1983 claims is reserved for exceptional circumstances. "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." DeAnzona v. City and County of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000).

Based on the factors established in Uhlrig and Armijo, the district court was correct to reject Appellants' due process claim under a danger creation theory.

## 2. Special Relationship

Appellants also contend they were deprived of due process because of a special relationship created when Eckert was taken into custody. "In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf--through incarceration, institutionalization, or other similar restraint of personal liberty--which is the 'deprivation of liberty' triggering the protections of the Due Process Clause."

-19-

DeShaney, 489 U.S. at 200. Such restraint must be involuntary to create an affirmative duty to protect. Liebson v. New Mexico Corrections Dept., 73 F.3d 274, 276 (10th Cir. 1996).

In Appellants' case, however, there is no indication that she or her son were subjected to private violence during the time she was incarcerated. Moreover, Appellants have not convincingly shown how police interfered with Eckert's ability to protect herself, her son or her property after her release.

Interference with an individual's ability to fend for themselves is the cornerstone to the special relationship exception to DeShaney. See DeShaney, 489 U.S. at 201. In DeShaney, a case involving the duty of social workers to abused children, the Supreme Court denied that a special relationship created an affirmative duty for social services officials once they had returned the boy to his family: "That the State once took temporary custody . . . does not alter the analysis, for when it returned [Joshua DeShaney] to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter." Id. Likewise, any special relationship between Appellants and SPD ended on October 5, 1994 when Eckert was released from police custody.

**C.     Failure to Train**

Because Eckert's arrest was deemed proper, the court below never reached the issue of Appellants' claim that the SPD failed to train its officers. Such a failure by authorities can provide the basis for a § 1983 claim. "Where a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability." Currier v. Doran, 242 F.3d at 923 (quoting Sutton v. Utah State Sch. for Deaf and Blind, 173 F.3d 1226, 1240 (10th Cir. 1999)). For a cognizable § 1983 claim, a plaintiff must go beyond allegations that officer training is merely deficient. "A supervisor or municipality may be held liable where there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." Meade v. Grubbs, 841 F.2d 1512, 1528 (10th Cir. 1988).

In their brief, Appellants correctly note that failure to train claims may be based on both equal protection and due process violations. See Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998) (equal protection); Sutton, 173 F. 3d at 1240 (due process). However, as the above discussion indicates, Appellants have not made valid claims of actionable violations under either clause. The determination of whether a municipal policy is characterized by deliberate indifference is usually for a jury to decide. See Lee v. City of Los Angeles, 250 F.3d 668, 682 (9th Cir. 2001). But a jury determination is unnecessary where a

plaintiff has not linked the failure to train to an injury of constitutional proportions.  <u>City of Canton v. Harris</u>, 489 U.S. 378, 390 (1989).

**D.     Qualified Immunity**

Appellees raise the defense of qualified immunity on appeal.  Because Appellants have not articulated a cognizable constitutional claim, we need not address this issue.

## Conclusion

In sum, we hold that the summary judgment of the district court was proper and should not be set aside.  Therefore, the district court's Memorandum and Order are  **AFFIRMED.**

ENTERED FOR THE COURT


Clarence A. Brimmer
United States District Judge