**UNITED STATES of America, Plaintiff,**

v.

**Robert LAWRENCE, Defendant.**

**No. 4:02CR3080.**

United States District Court, D. Nebraska.

Oct. 24, 2002.

John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for Defendant.

Steven A. Russell, Assistant United States Attorney, Lincoln, NE, for U.S.

## MEMORANDUM AND ORDER

KOPF, District Judge.

This matter is before the court on the magistrate judge's report and recommendation (filing 24) regarding the defendant's motion to suppress (filing 11). No objections to the report and recommendation have been filed.

Pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, I have reviewed de novo the report and recommendation, together with the transcript of the evidentiary hearing that was conducted by the magistrate judge on September 26, 2002 (filing 23). I find that inasmuch as the magistrate judge has fully, carefully, and correctly found the facts and applied the law, the report and recommendation should be adopted.

IT IS ORDERED that:

1) the magistrate judge's report and recommendation (filings 24) is adopted; and

2) the defendant's motion to suppress (filing 11) is denied.

## REPORT, RECOMMENDATION AND ORDER

The defendant, Robert Lawrence, has filed a motion to suppress all evidence obtained and incriminating statements arising from the January 6, 2002 warrantless entry of his home located at 910 West B Street in North Platte, Nebraska. (Filing 11). Defendant claims that no exigent circumstances existed to excuse the lack of a warrant, and that he did not voluntarily consent to the officers' entry to the home. He argues that the "plain view" of weapons in his home, his statements that he owned these weapons, and any evidence arising and forwarded to federal authorities during the investigation that followed, must be suppressed under the Fourth Amendment. For the reasons discussed herein, I conclude that defendant's motion to suppress should be denied.

On January 6, 2002 at approximately 12:30 a.m., the North Platte Police Department received a 9–1–1 call from a distraught female. The dialogue, as recorded by the 9–1–1 operator, (see exhibit 1), was as follows:

Dispatcher: 9–1–1. What is your emergency?

Female: Um. (pause).

Dispatcher: Is there a problem there ma'am?

Female: Yeah. It's a (inaudible)[1] problem, I would say.

Dispatcher: You think ... (interrupted)

Female: (inaudible).

Dispatcher: And are you involved...or somebody else?

The female did not respond to this question and her phone hung up.

---

1. Several different cassette playing devices were used in an attempt to discern this word, (as well as the remainder of the inaudible portions of this tape). The word was never clear, but using a dictaphone with headphones, it is probable that the female was reporting what she referred to as a "domestic" problem.

Consistent with 9–1–1 protocol, the dispatcher called back the number of this incoming phone call. A male voice answered.

Male: Hello.

Dispatcher: Hi. This is the police department. What's going on there?

Male: Uh. There's nothing going on. My wife is drunk and she's starting to abuse me. I'm trying to just .. (a female begins yelling in protest in the background-her specific words are inaudible).

Dispatcher: So in other words you two are having a fight then? (female continues to yell in background-her words are inaudible).

Male: No.

Dispatcher: (Inaudible) (interrupted)

At this point, the male began yelling to the female, "Would you stop this Chris?" She responded, "No. You were the one that . . . ." She then spoke to the dispatcher on the phone in a tearful, hesitant, or frightened voice.

Female: Hello.

Dispatcher: Okay, what's going on there?

Female: He's the one that (inaudible).

The telephone was again abruptly hung up. Police officers were immediately dispatched to the home to investigate a possible domestic dispute. It was later determined that the female 9–1–1 caller was Christina Cardenas, the defendant's girlfriend and the mother of his four-year-old son. The male on the phone was the defendant, Mr. Lawrence, who lived with Ms. Cardenas and their son in the home at 910 West B Street.

North Platte police officer Bryan Folchert responded to the dispatch. He and Officer Johnston arrived at the home about one minute after receiving the dispatch. Although Officer Folchert had responded with both lights and sirens acti-

vated on his vehicle, there was no response from anyone in the house. The house was dark and its occupants were silent. Having identified himself as a police officer, Officer Folchert knocked on the front door for several minutes while Officer Johnston observed the side and back of the home. Nothing was seen and no one responded to the persistent knocking.

North Platte police officer Myers and Investigator Houpt arrived at the home. Officer Myers joined Officer Forchert in knocking at the front door and demanding entry into the home. Investigator Houpt proceeded to stand in the yard and watch the home from a safe and backup position. By this time, over five minutes had elapsed but none of the officers had seen or heard the female occupant of the residence. They were very concerned that she may be injured and either due to intimidation or injury, was unable to respond to their knocking. Officer Forchert, at the front door of the house, and Officer Johnson at the back door, continued to knock and demand entry, now threatening that if they were not given access to the woman and an opportunity to assure that she was safe, they would enter the home by force.

The defendant began yelling at the officers and, using profane language, demanded that they leave the property and allow him to sleep. The officers contacted their supervisor, Sergeant Steve Reeves, and advised him that they were considering forcible entry into the home to assure the female's safety and, if needed, provide her access to assistance. Sergeant Reeves told them to wait until he arrived.

Sergeant Reeves had heard the previous communications over the dispatch and arrived promptly at the home. By that time, approximately ten minutes had passed since the initial call had been made to 9–1–1, but no one had seen or spoken with the female. When Sergeant Reeves arrived,

the commotion in the home was focused at the back door. Officer Forchert remained at the front door knocking and attempting to coax the female out of the home. Sergeant Reeves joined the other officers in the back where the defendant continued to yell profanities, demand that the officers leave, and banged at the door from the inside (either by kicking it or throwing objects at it). The defendant was repeatedly telling Ms. Cardenas that the officers would not be allowed into the home without a warrant. The officers did not hear this statement, although Sergeant Reeves did hear Mr. Lawrence say that he was contacting his lawyer. For at least five minutes, the defendant continued to yell at the officers from the back of his home and refused their demands for access.

While the defendant was at the rear of the home, Sergeant Reeves called the dispatcher and told her to call the home again. The dispatcher was to tell the woman inside to open the front door and speak with Officer Forchert so he could make sure she was safe. Dispatch made this call and Ms. Cardenas answered the phone. From his vantage point on the cement landing by the front door, Officer Frochert could look in the front windows. In the dark home, and illuminated by background light entering the home through other windows, he could see the silhouette of someone he believed to be female pacing in the front room. Ms. Cardenas opened the front door, and in a tearful and frightened voice, stated that she was alright and that she wanted to go to sleep. Officer Forchert tried to coax her out of the house, but the defendant noticed that Ms. Cardenas had opened the door and demanded that she close it. She promptly complied.

The door had been open for only five to ten seconds and no lights had been turned on. Officer Forchert could not clearly see

Ms. Cardenas in the darkness and did not know if she had any marks of bruising or injury. The officer was relieved to see that she was alive and not seriously hurt at that time, and with this information, the urgency of the situation had dissipated somewhat. However, based on his law enforcement training, and in light of his inability to visually verify Ms. Cardenas' statement that she was not injured, Officer Forchert remained concerned that Ms. Cardenas was too intimidated to speak truthfully with the officer about her condition and was at immediate risk of physical harm. Underlying this concern was her 9-1-1 call for help; the fact that conversations with dispatch were twice disconnected; the sound of fear and crying in Ms. Cardenas' voice when she finally opened the door; her reluctance to open the door and the fact that she immediately closed it upon defendant's demand; and the defendant's obviously angry, agitated, and volatile demeanor within the home.

Based on these factors, his training, and fifteen years of law enforcement experience, Sergeant Reeves likewise believed that Ms. Cardenas remained at risk if she stayed inside this home. When Sergeant Reeves heard by radio that Officer Forchert had made contact with Ms. Cardenas at the front door, he and Investigator Houpt immediately went to the front of the house, but before they arrived, the door had already been closed. Sergeant Reeves, along with Officer Forchert and Investigator Houpt, continued to knock at the front door and advise the defendant that unless they were allowed to speak privately with the woman inside and confirm that she was not at risk, they would be required to enter the home by force. The defendant opened the door and told the officers not to force their way in. Mr. Lawrence was holding a beer and smelled of alcohol. When he saw Sergeant Reeves through the open door, he stated, "Oh

great, Reeves is here," and slammed the door. Sergeant Reeves had previously arrested this defendant.

Sergeant Reeves repeatedly told the defendant through the closed door that he would not leave until he had spoken with the woman in private and was sure she was safe. A few minutes later the defendant opened the door and advised the officers that Ms. Cardenas was getting dressed so she could come outside and meet with them.

With the wooden interior door of the home open, Sergeant Reeves could hear the defendant speaking with Ms. Cardenas about getting dressed and the cold temperatures outside. The defendant then returned to the door and told the officers that since it was so cold, she was not coming outside but one officer could enter the home to speak with Ms. Cardenas. Sergeant Reeves advised the defendant that, for officer safety, two officers must be allowed to enter. The defendant agreed to allow two officers inside. Since the defendant was angry with Sergeant Reeves, Officer Forchert entered the home, followed by Investigator Houpt.

Officer Forchert proceeded directly to Ms. Cardenas and followed her down the hall to a back bedroom and away from the living room where the defendant was standing. Investigator Houpt stayed with the defendant. The light was on in Ms. Cardenas' bedroom and the four-year-old son was lying in the center of the bed. Officer Forchert asked Ms. Cardenas if she was alright and she stated that she was. The officer also spoke with the son. Officer Forchert offered to help Ms. Cardenas arrange outside assistance, contact family or friends, or provide transportation to another and safe location. She refused these offers for assistance, but she did not ask the officer to leave her bedroom.

When the officer stepped into the bedroom, he looked around the room to assure himself that no other persons were present. He noticed two guns hanging on a gun rack on the wall opposite the bedroom door. After his brief conversation with Ms. Cardenas, Officer Forchert went to the living room and asked the defendant if the guns in the bedroom were the only firearms in the house. When Investigator Houpt heard this question, he recalled Sergeant Reeves relating that Mr. Lawrence had a prior felony cocaine conviction. Investigator Houpt went to the front door and told Sergeant Reeves that weapons had been located. Sergeant Reeves asked the defendant for consent to search the home. The defendant would not consent and stated that the police needed to "go by the book." The defendant was arrested for being a felon in possession of firearms.

At Sergeant Reeves' instruction, Investigator Houpt returned to the police station, documented the factual basis for obtaining a warrant, presented this information to a judge, and returned to the residence with a warrant to search the home. While the search warrant was being obtained, officers remained at the home to ensure that any evidence was secure, but no search was conducted until the warrant was obtained. The information obtained from the entry of defendant's home and the later search pursuant to a warrant was forwarded to federal Alcohol, Tobacco, and Firearms ("ATF") authorities. Prompted by the information they received from Sergeant Reeves, the ATF requested a copy of the forms completed by this defendant when he purchased the weapons. Sergeant Reeves obtained this additional information from the North Platte Wal–Mart and provided it to the ATF. The defendant is now facing a federal indictment for felon in possession of firearms and for providing false statements to purchase a weapon. (Filing 1).

Defendant claims that the warrantless entry of his home by law enforcement violated his Fourth Amendment rights. The police may conduct a search without a warrant and without probable cause if the suspect voluntarily consents to the search. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). A police officer's warrantless entry and search of a home may also be justified if exigent circumstances are present. *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). I conclude that the defendant consented to entry of his home when he chose to have the officers enter the house rather than have Ms. Cardenas meet outdoors with the officers to discuss her safety. Even had no consent been given, the officers' entry was justified by exigent circumstances, specifically to determine the safety of Christina Cardenas.

■ A consent to search is voluntary "if it [is] 'the product of an essentially free and unconstrained choice by its maker,'" rather than " 'the product of duress or coercion, express or implied.'" *United States v. Chaidez,* 906 F.2d 377, 380 (8th Cir.1990) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854(1973)). In assessing whether the officers violated Mr. Lawrence's Fourth Amendment rights, the question is whether a reasonable officer under the circumstances would believe that the defendant validly consented to allow the officers to enter his home. *United States v. Jones,* 254 F.3d 692, 695 (8th Cir.2001); *United States v. Sanchez,* 156 F.3d 875, 878 (8th Cir.1998). (See also, *Illinois v. Rodriguez,* 497 U.S. 177, 188, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). The government has the burden of proving by a preponderance of the evidence that Mr. Lawrence voluntarily consented to the entry or that the officers' belief that he did was reasonable. *Id.; United States v.*

*Miller,* 20 F.3d 926, 930 (8th Cir.1994). I find the government has met this burden.

Undoubtedly, at an earlier time that night, when Mr. Lawrence was ranting and shouting profanities and was wholly unwilling to allow the officers to verify that Ms. Cardenas was safe, the officers had threatened a forcible entry of Mr. Lawrence's home for that purpose. Even when the officers knew she had not sustained life-threatening injuries, they were refusing to leave without first talking to her privately.

However, before the officers entered the home, they had made it clear to the defendant that their purpose was not to enter the house but to privately speak with Ms. Cardenas. The defendant understood what the officers were requesting, as evidenced by the initial plan to have Ms. Cardenas go outside to speak with the officers rather than having them enter the house. The officers were fully satisfied with this solution because it served the underlying purpose of their diligent attempt to speak with Ms. Cardenas. They would be able to visually observe her for evidence of injury, remove her from any confrontational or dangerous situation, and give her an opportunity to speak with them candidly and outside any atmosphere of intimidation potentially created by defendant's presence. Without any demand by the officers to conduct their conversation with Ms. Cardenas in the house rather than outside, and under circumstances where the defendant's temper had calmed considerably, the defendant chose to have the officers come into the home so that Ms. Cardenas would not have to go out in the cold.

Although the officers were demanding contact with Ms. Cardenas, and were not requiring that contact to be inside the home, the defendant argues that he only agreed to allow the officers into the home

because they were threatening to enter by force. "[C]onsent is involuntary when 'under all the circumstances it ... appear[s] that the consent was ... granted only in submission to a claim of lawful authority.'" *United States v. Larson*, 978 F.2d 1021, 1023 (8th Cir.1992) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).

■ The voluntariness of a consent is a question of fact to be determined from a totality of the circumstances. *Bustamonte*, 412 U.S. at 227, 93 S.Ct. 2041. In assessing these facts, the court may consider the defendant's age, general intelligence and education, whether he was intoxicated or under the influence of drugs when consenting, whether he consented after being informed of his right to withhold consent and whether, because of previous arrests, he was aware of the protections afforded to suspected criminals by the legal system. In addition, the characteristics of the environment in which his consent was given are considered, including whether Mr. Lawrence was detained or questioned; was threatened, physically intimidated, or punished by the police; relied upon promises or misrepresentations made by the police; was in custody or under arrest when the consent was given; was in a public or a secluded place; or either objected to the search or stood by silently while the search occurred. These factors are not applied mechanically, and no single factor is dispositive or controlling. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir.2000).

■ Mr. Lawrence's reason for permitting the officers into the home was to avoid Ms. Cardenas' exposure to the cold, not because he was acceding to the officers' legal authority. The basis for this decision was rational and did not appear to be the product of intoxication. The defendant is an adult who understood his right to deny consent. He had prior exposure to the criminal justice system, apparently had access to a lawyer, and had previously told Ms. Cardenas that night that the officers could not enter the home without a warrant. His later refusal to agree to a search of the home, instead demanding that the officers go "by the book," further confirms that he knew he could refuse to allow the officers into the home. The police demanded access to Ms. Cardenas. They were not threatening to enter the home, provided she was willing to come out and the defendant was willing to let her. The officers' willingness to speak with Ms. Cardenas outside the house provided the defendant with the freedom to "terminate the encounter or to refuse the consent request" to enter the home. *U.S. v. Zamoran–Coronel*, 231 F.3d 466, 469 (8th Cir.2000). The defendant was in his own home, not an unfamiliar and intimidating setting created by police detention.

I conclude that under the totality of the circumstances, the officers reasonably believed that Mr. Lawrence understood he could choose between allowing the officers to enter the home or requiring them to speak with Ms. Cardenas outdoors. He chose to allow them inside and he therefore consented to their entry of the home.

■ Even absent consent, the entry into the home was justified by exigent circumstances. It is not necessary to obtain a warrant to enter a home if lives are threatened. *U.S. v. Ball*, 90 F.3d 260, 263 (8th Cir.1996); *U.S. v. Clement*, 854 F.2d 1116, 1119 (8th Cir.1988). The police bear the burden of proving an urgent need that justified a warrantless search. The question in this case is not whether Ms. Cardenas was actually at risk of physical injury, but whether the officers were reasonable in believing that exigent circumstances existed. *Id.* Police officers "may enter a dwelling without a warrant to render emergency aid and assistance to a person

whom they reasonably believe to be in distress and in need of that assistance." *U.S. v. Nord,* 586 F.2d 1288, 1291 n. 5 (8th Cir.1978). I conclude that the officers were objectively reasonable in believing that Ms. Cardenas was or may be at imminent risk of physical harm, and their entry into the home to provide assistance or assure her safety was justified.

Domestic disputes present a very real danger of physical injury. The Supreme Court, relying on many scientific studies, has recognized the pervasive and violent nature of domestic disputes. "[I]n an average 12–month period in this country, approximately two million women are the victims of severe assaults by their male partners." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 891, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (citations to authorities omitted). This figure is likely a marked underestimate, representing only one-half of the total victims "because the nature of these incidents discourages women from reporting them."[2] *Id.* In this country, "[t]hirty percent of female homicide victims are killed by their male partners." *Id.* at 892, 112 S.Ct. 2791.[3]

Ms. Cardenas called 9–1–1 to ask for emergency help. The call was disconnected. A return call to the house was answered by a man, later determined to be the defendant, who asserted that he was the victim of abuse. Ms. Cardenas was protesting this characterization in the background of the conversation, but when she tried to talk directly to the dispatcher, her voice was distraught and all she could say was "He was the one...," before the line was again disconnected. Only one minute later when police arrived the house was dark and quiet with no one responding to the officers' knocks for several minutes. These facts alone justified the officers' warrantless entry into the home to determine the occupants' safety. *State v. Beeder,* 1996 WL 80580 (Neb.App.1996)(Where neighbors reported seeing woman hit and screaming, officers arrived at scene and knocked and announced their presence several times, received no answer, and heard no sounds coming from within the house, officers justified by exigent circumstances to enter the home "to see if anybody was hurt").

Ultimately, the defendant broke the silence, voicing his anger at the officers' presence and repeated demands to enter by kicking or throwing things at the back door as he yelled profanities. A full ten minutes after the call had been made to 9–1–1, the officers had yet to see or hear form Ms. Cardenas. When she finally opened the front door while the defendant was occupied at the back door, she stated she was not harmed but her voice indicated that she was fearful and crying. She would not come out of the house. When the defendant demanded that she close the door, she did so immediately. Although the officers now knew she was alive, they did not know if she had been harmed or if the defendant, in his agitated and enraged state, was about to harm her. The officers persisted to assist a woman whose calls for

---

**2.** The Department of Justice estimates that up to 4 million women are physically abused by their husbands or live-in partners each year. Hearings on Violence Against Women Act of 2000, Pub.L. 106–386, Div. B, 114 Stat. 1491 (Oct. 28, 2000), set forth at 146 *Cong. Rec.* H8086–02 at *H8098, 2000 WL 1403825 (daily ed. September 26, 2000). I further note that "[a]lthough women are the victims in a vast majority of domestic violence cases ... it is also possible for a man to be a victim of domestic violence." *Eckert v. Town of Silverthorne,* 25 Fed. Appx. 679, 684, 2001 WL 1152781 at *3 (10th Cir.2001)(citing *Ricketts v. City of Columbia,* 36 F.3d 775, 781 (8th Cir.1994).

**3.** See also extensive testimony at *id.,* 146 *Cong. Rec.* at *H8086–8105, 2000 WL 1403825.

help had been disconnected and whose access to assistance had been cut off by the defendant.

The officers' response to the situation was not only justified by the exigencies, but given the well-known danger officers face in responding to domestic disputes, laudable.[4]

> Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.

*Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir.1998)(upholding warrantless entry where officer reasonably believed someone inside the home had been injured or was in danger, domestic dispute had been reported, such reports were a "priority," neighbors stated that fighting ended just before officers arrived, a window was broken, and the home was now silent.) See also, *U.S. v. Warden,* 886 F.Supp. 813, 815 (D.Kan.1995)(finding exigent circumstances justified warrantless entry of home where juvenile called 9–1–1 to report that her father was beating her mother,); *U.S. v. Guarente,* 810 F.Supp. 350, 353 (D.Me.1993)(holding that although the dispute had partially subsided, based on 9–1–1 call reporting domestic dispute involving firearm, and the volatile nature of domestic disputes generally, the officers had a strong reason to believe that defendant's wife and children remained in immediate danger.); *State v. Comer,* 51 P.3d 55, 64 (Utah 2002)(finding that reliable tip of

"family fight in progress," accompanied by woman's unexplained retreat into the home after telling officers her husband was home, established probable cause to believe exigent circumstances justified warrantless entry); *People v. Beuschlein,* 245 Mich.App. 744, 630 N.W.2d 921 (2001)(holding warrantless entry justified as exigent circumstance where police received 911 call reporting domestic violence, caller indicated there were guns and knives on the premises, and police officers heard sounds of a scuffle within the home immediately before entry); *State v. Applegate,* 68 Ohio St.3d 348, 626 N.E.2d 942, 942–43 (1994)("Exigent circumstances justify a warrantless entry into a residence by police when police are there pursuant to an emergency call reporting domestic violence and where the officers hear sounds coming from inside the residence which are indicative of violence.")

The defendant states that even if the officers were reasonable in initially investigating Ms. Cardenas' 9–1–1 call, they were unreasonable in demanding to speak with her privately once she assured them she was unharmed. However, although he spoke with her only briefly in the dark, Officer Forchert noted the fear in Ms. Cardenas' voice, believed she was crying (a fact confirmed by Ms. Cardenas' testimony), and was not convinced that her statement was credible or, if true, would remain true if she stayed in the home with the defendant.

■ Domestic abusers intimidate and control their victims.[5] Women in such households often are forced into social and economic isolation, and remain with their

---

4. Domestic disputes are "one of the most feared calls that a police officer must respond to. The reason for this is that more officers are killed or injured on domestic violence calls than on any other type of call." *"Violence Against Women Act of 1994,"* Pub.L. 103–322, Title IV, 108 Stat.1902: *Hearings before Senate Judiciary Committee,* 1994 WL 530624 (F.D.C.H.)(Sept. 13, 1994)(statement

on behalf of National Task Force on Domestic Violence).

5. "Battering instills a sense of control and fear in a victim through series of behaviors that include intimidation, threats, psychological abuse, isolation and physical violence." Hearings on Violence Against Women Act of 2000, Pub.L. 106–386, Div. B, 114 Stat. 1491 ( Oct. 28, 2000), set forth at 146 *Cong. Rec.*

abusers because they perceive no superior alternative. *Casey*, 505 U.S. at 891, 112 S.Ct. 2791. Even those women who find temporary refuge in shelters often return to their husbands usually due to lack of independent income. *Id.* "In domestic violence situations, officers may reasonably consider whether the victim is acting out of fear or intimidation, or out of some desire to protect the abuser, both common syndromes." *Fletcher*, 196 F.3d at 52.[6]

In response to these challenging and violent situations, the North Platte police are trained to separate the parties in a domestic abuse situation, thereby offering a safe environment for the victim to talk honestly with the officers and ask for or accept their help. Rather than exhibiting police dominance, the officers' insistence on talking with Ms. Cardenas privately was perfectly reasonable under these circumstances, and, it appears, actually helped in restoring some calm to the situation.

Even when the possible victim of domestic abuse assures the officer that she is in no danger, an officer is entitled to consider all the facts and is not required to take her statement at face value in assessing the potential threat of physical harm.[7] *U.S. v.*

---

H8086–02 at *H8095, 2000 WL 1403825 (daily ed. September 26, 2000).

**6.** Numerous and complex intervening factors influence an abused woman's refusal to cooperate with or seek assistance from law enforcement. One authority listed the following:

(1) Fear of retaliation—Retaliation for engaging in behavior that is unacceptable to the batterer may take the form of recurrent or escalating violence toward either the woman or her children, family members, or friends;

(2) The economic resources available to her—When a woman and her children are economically dependent upon the abusive partner, calling the police may eventually mean an inability to support the family, loss of their home, and her inability to provide the basic necessities.

(3) Concern for the children—Some women believe that, even in an abusive relationship, separating children from their father may harm the children.

(4) Emotional attachment to her partner—When a relationship becomes abusive, the woman's prior attachment to her partner does not immediately sever. If the batterer follows an abusive episode with apologies, gifts, promises, or the expression of vulnerability, the attachment may even strengthen.

(5) Personal emotional strengths—Hope and optimism in the face of hardship, often considered psychological strengths, will cause some women to believe the violence will eventually end.

(6) Race, ethnicity, and culture—A woman's racially, ethnically, and culturally-based values, beliefs, and attitudes may help her to resist and challenge violence or abuse.

(7) Emotional weakness, mental and cognitive inabilities, and physical vulnerabilities may limit the woman's ability to leave.

(8) Perception of the availability of social support—For example, arrest and incarceration may be viewed by a battered woman as supportive if she believes that such action will stop the violence or, alternatively, as obstructionistic if she fears that arrest will only increase the likelihood of continued abuse after the batterer is released.

Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered Woman Syndrome*, 21 Hofstra L.Rev. 1191, 1232–1239 (1993)(cited in *Fletcher*, 196 F.3d at 52).

**7.** Testimony before Congress in 1995 noted the historical underpinnings that may have contributed to the reluctance of women to seek out law enforcement help. Until 1874, it was legal for husbands to physically chastise their wives, an attitude that persists today. The truth is that in 1995, batterers can get away with it, victims don't tell and often when they do[,] no one pays attention.... Testimony in support of Domestic Violence Awareness Month, 141 *Cong. Rec.* H10720–01, *H10723, 1995 WL 622612 (daily ed. October 24, 1995).

States have attempted to respond. "A growing number of States have passed laws requiring police to follow through on their investigation of any complaint of domestic violence, even if the plaintiff subsequently asks to have the complaint withdrawn." *Id.*

*Bartelho,* 71 F.3d 436, 441 (1st Cir.1995) (finding that although alleged victim stated the alleged abuser had left the premises, officers were not required to take her statement at face value, especially given their domestic-abuse training). "[I]t is well accepted that domestic violence victims often refuse to report the abuse." *State v. Mielke,* 653 N.W.2d 316, 2002 WL 2016946 (Wis.App. Sept.4, 2002). See also, *People v. Mascarenas,* 972 P.2d 717, 720 (Col.App.1998)(finding that even though woman denied being hit, exigent circumstances justified entering home where family member reported domestic violence, woman admitted she had a fight with defendant, appeared upset, and had old black eye, and experienced officer testified that victims in domestic violence situations are often uncooperative and "they tell you nothing happened even if it did."); *People v. Higgins,* 26 Cal.App.4th 247, 31 Cal. Rptr.2d 516 (1994) (holding exigent circumstances justified officers' warrantless entry where despite resident's attempts to assure officers that nothing was wrong, alleged domestic abuse victim appeared frightened, had marks on her face, lied about being alone, and gave officers suspicious story about having fallen down stairs).

Police must often make balanced choices, but domestic violence situations require police to make particularly delicate and difficult judgments quickly. *Fletcher,* 196 F.3d at 50.

> On the spot reasonable judgments by officers about risks and dangers are protected. Deference to those judgments may be particularly warranted in domestic disputes. In those disputes, violence may be lurking and explode with little warning. Domestic violence victims may be intimidated or suffer from a dependence inherent in the abusive relationship. The signs of danger may be masked.

*Id.* (citing *State v. Greene,* 162 Ariz. 431, 784 P.2d 257, 259 (1989).

The officers responding to Ms. Cardenas' call for help approached an initially dark and quiet house, but the later actions of Mr. Lawrence and his refusal to allow the officers to speak with Ms. Cardenas privately raised serious questions concerning her welfare. Her tearful statement that she was not at risk of harm—spoken in a circumstance where Mr. Lawrence was restricting her ability to speak with officers at all, much less out of his controlling presence—did little to allay the officers' concern. Mr. Lawrence determined whether, and under what circumstances Ms. Cardenas would be allowed to speak with the police. The officers' observations amply demonstrated that even in her own home, Mr. Lawrence controlled her access to leave, her access to call 9–1–1 for help, and her ability to privately speak with law enforcement. Although Ms. Cardenas told Officer Forchert that she did not need help, in the context of the circumstances of this encounter and the nature of domestic dispute victims and abusers, the officers were reasonable in questioning the credibility of Ms. Cardenas' statement and further pursuing their investigation to assure her safety.

> Police officers responding to a domestic violence report have a duty to ensure the present and continued safety and well-being of the occupants ....Here, Officers [Forchert] and [Houpt] had a duty to assure the safety of [Ms. Cardenas] and the child by ensuring that [Lawrence] posed no continuing threat to them.... [T]hey were not obligated to believe [Ms. Cardenas'] insistence that no problem existed. In addition, the fact that the occupants appeared to be unharmed when the officers entered did not guarantee that the disturbance had cooled to the point where their continued safety was assured....Police of-

ficers are entitled to consider [many factors] in the process of evaluating a given situation. The officers had obvious reasons to be concerned. Courts should be reluctant to rule after the fact that while there were reasons, they were not sufficient.

*State v. Raines,* 55 Wash.App. 459, 465–66, 778 P.2d 538, 542–43 (1989).

When the officers entered the home, Ms. Cardenas escorted Officer Forchert to her bedroom. Entry into the bedroom was justified by the exigent circumstances existing and, in any event, by directing the officer to her bedroom, Ms. Cardenas indicated her consent that he enter that area of the home. On this issue Ms. Cardenas' testimony contradicts Officer Forchert's in several respects. She claims she was sitting in the dark in her bedroom and getting dressed when he arrived at the bedroom door, that lights were never turned on in that room, and that the officer had no reason to enter the room since he could have conversed with her from the doorway. The guns hanging on the wall were not visible to the officer unless he actually entered the room. (See Exhibits 110 and 111).

I do not find Ms. Cardenas' testimony on this issue credible. Ms. Cardenas was, by her own admission, very intoxicated when this incident occurred, and her memory of the facts is suspect. Further, when Officer Forchert asked her who owned the guns hanging on the wall she initially responded that they were the defendant's. Once she realized that this statement would harm Mr. Lawrence, who had a prior felony conviction, she lied to the officers by stating that the guns were hers, because she did not want Mr. Lawrence to get in trouble, a concern she again acknowledged at the suppression hearing. I conclude that Officer Forchert's presence inside the bedroom was justified by exigent circumstances and, in addition, was with Ms. Cardenas' consent.

■ From his location inside the bedroom, Officer Forchert saw the guns hanging on the wall. "The plain view doctrine allows police officers to seize evidence without a warrant when (1) 'the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed,' (2) the object's incriminating character is immediately apparent, and (3) the officer has 'a lawful right of access to the object itself.'" *U.S. v. Murphy,* 69 F.3d 237, 241–42 (8th Cir.1995)(citing *U.S. v. Hughes,* 940 F.2d 1125, 1126–27 (8th Cir.1991)(quoting *Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). Officer Forchert's entry into this bedroom did not violate the Fourth Amendment. The weapons were in plain view from this position, and once it was learned that the defendant had previously been arrested on a felony drug charge, their incriminating character was obvious. Although the guns could have been immediately seized, they were not seized until a search warrant was obtained. The Fourth Amendment does not require suppression of this evidence.

The statements of Mr. Lawrence relating to gun ownership and his application for purchasing a gun from Wal–Mart arose from the plain view of these weapons in the bedroom. There is no constitutional basis for suppression of this evidence under the Fourth Amendment or as fruit of the poisonous tree.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Chief United States District, pursuant to 28 U.S.C. § 636(b)(1)(B), that the defendant's motion to suppress be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may

be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT IS FURTHER HEREBY ORDERED: Trial is set for 9:00 a.m. on December 9, 2002, for a duration of three trial days before the Honorable Richard G. Kopf. Jury selection will be at the commencement of trial.