Paul RICKETTS, Sr., Plaintiff–Appellant,

Paul Ricketts, Survivor of Marge Ricketts; Kimberly Stephens; Plaintiffs,

Kimberly Roth, Plaintiff–Appellant,

v.

CITY OF COLUMBIA, MISSOURI, Defendant–Appellee,

Ben White, Officer; Ernie Barbee, Chief of Police, City of Columbia; John Doe, Unknown Officers A–X; Lawrence Brady; Craig Klein; B. Arnold; Dennis Veach; Randy Boehm; Joseph Fagiolo; C. Antimi; L. Calvert, Defendants.

Association of Trial Lawyers of America, Amicus Curiae.

No. 93–3633.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1994.

Decided Oct. 11, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 9, 1994.*

ing with suggestion for rehearing en banc.

Michael W. Manners, Independence, MO, argued, for appellant.

Eugene K. Buckley, St. Louis, MO, argued (John S. McCollough, on the brief), for appellee.

Before HANSEN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

HANSEN, Circuit Judge.

Kimberly Roth and her father, Paul Ricketts (the plaintiffs), appeal the district court's[1] grant of judgment as a matter of law in favor of the City of Columbia, Missouri, in their action brought pursuant to 42 U.S.C. § 1983. The plaintiffs sued the City alleging that it carried out a discriminatory custom of treating domestic abuse cases less seriously than nondomestic abuse cases, which was based upon an intent to discriminate against women. The plaintiffs contended that as a result of this custom, Kimberly's husband at the time, Sonny Stephens, harassed and sexually assaulted Kimberly and murdered her mother, Marge Ricketts. The district court set aside a jury verdict in favor of the plaintiffs in the amount of $1,200,000, concluding that the plaintiffs failed to establish the essential elements of their § 1983 equal protection claim. 856 F.Supp. 1337. We affirm.

## I. Background

Kimberly met Sonny Stephens in 1978. They began to live together shortly thereafter and married in 1982. Their relationship was riddled with argument and abuse. They temporarily separated several times, once because Sonny was incarcerated. When Sonny was at home, he often abused Kimberly both verbally and physically.

On September 11, 1986, Kimberly sought and received an *ex parte* order for protection from the Boone County Circuit Court. In her petition, she stated that she feared Sonny because he "has broke[n] my nose" and "threaten[e]d to kill me if I leave him." (Jt.App. at 224.) The Boone County Circuit Court ordered Sonny to refrain from "[a]busing, threatening to abuse, molesting or disturbing the peace of the petitioner ... or [e]ntering the dwelling of petitioner, located at 909 Grand, Columbia, Mo." (*Id.* at 227.)

After obtaining the protection order, Kimberly and her five children moved from the court order protected location at 909 Grand into her parents' (Paul and Marge Ricketts') home at Holly Park Trailer Court. Sonny was visiting a friend who lived across the

street from the Ricketts' home, and he saw Kimberly and her father return from the courthouse. Sonny became enraged and began yelling threats. Kimberly called the sheriff's office and requested that they serve Sonny with the protection order. The sheriff's office responded within ten minutes and served Sonny with the protection order. Paul Ricketts and the sheriff overheard Sonny say that he was going to get a shotgun, and Kimberly knew that Sonny had a shotgun in their home at 909 Grand. The Ricketts called 911 and officers searched the home at 909 Grand but were unable to find either Sonny or a shotgun. When Sonny returned to his friend's trailer across the street from the Ricketts' home, he had a sawed-off shotgun and he continued yelling threats. Kimberly called the police again, discovered that officers had been sent to 909 Grand, and requested protection at her parents' home. About 20 police officers responded to this call and surrounded the home. Sonny finally came outside, but without the shotgun. Eventually, Sonny was subdued. He was allowed to leave the area without being arrested.

That night, Kimberly's father's pickup truck was vandalized. When a police officer responded to a call about the vandalism the next morning, Kimberly told him that she was concerned about Sonny's shotgun and that she believed Sonny was keeping it in his friend's home across the street. The officer questioned Sonny's friend, who surrendered the weapon. During the next week, Sonny telephoned the Ricketts' home repeatedly, but Kimberly refused to talk with him. Sonny knocked on Kimberly's bedroom window one evening, and at another time, he threatened that if she did not return home he would kill her or someone in her family. Kimberly and her family called the police as a result of these threats, but Sonny was never arrested.

Only a week after receiving the protection order, Kimberly decided to go back to Sonny in an effort to protect herself and her family from his threats. Kimberly and the five children moved back into their home at 909

1. The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri, trying the case by consent of the parties pursuant to 28 U.S.C. § 636.

Grand, and on September 19, 1986, Kimberly and Sonny filed a signed document with the Boone County Circuit Court in which both parties consented to terminate the protection order. The abuse worsened after Kimberly returned home, but Kimberly did not report further abuse to the police until March 20, 1987, when she again sought and received a protection order.

This second *ex parte* order of protection prohibited Sonny from, among other things, threatening, disturbing, or "enter[ing] upon the premises of [her] dwelling." (*Id.* at 234.) This order became a full order of protection on April 3, 1987. Despite the protection order, Sonny continued to call and threaten Kimberly and her family, often while sitting outside in the area around the Ricketts' home where Kimberly again was staying. Kimberly, her family, and her lawyer called the police several times during late March and early April 1987 due to Sonny's continued harassment, but Sonny was never arrested. On one occasion during that period, an officer came to the Ricketts' home to take a report. No physical abuse occurred or was reported after entry of the protection order.

On April 7, 1987, at about 7:30 a.m., Kimberly was in the living room of her parents' home with her mother and her youngest daughter when Sonny entered the home without notice and began an argument. Sonny threatened Kimberly with a shotgun (not the same shotgun previously confiscated). When Kimberly's mother attempted to intervene and calm the situation, Sonny shot her in the stomach. She died later that day. Sonny then dragged Kimberly away to a nearby woods, where he sexually assaulted her. He released her one-and-one-half hours later.

The plaintiffs, Kimberly and her father, filed suit pursuant to 42 U.S.C. § 1983 against the City of Columbia, Missouri, Police Department and several of its personnel, seeking to obtain compensation for the injuries caused by Sonny's conduct of continued harassment, sexual assault, and murder. The individual defendants were dismissed on grounds of qualified immunity, and the case went to trial against only the City. At trial, the plaintiffs argued that the City violated their rights under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution on the basis of sex discrimination. They contended through use of statistics and testimony that the City maintained a discriminatory custom of treating domestic abuse less seriously than nondomestic abuse cases, that victims of domestic abuse are most often women, and that this discriminatory custom caused their injury by "emboldening" Sonny to continue his abusive behavior without fear of arrest.

The jury returned verdicts in favor of the plaintiffs, specifically awarding Kimberly $200,000 for the harassment she endured while the protection orders were in effect and $200,000 for the sexual assault on April 7, 1987; and awarding the plaintiffs $800,000 for the April 7, 1987, murder of Marge Ricketts. The district court set aside the verdicts, granting the City's renewed motion for judgment as a matter of law. The district court assumed without deciding that the City had an unwritten policy or custom that resulted in unequal treatment of domestic assaults vis-a-vis nondomestic assaults and reasoned that the plaintiffs (1) failed to prove that the custom caused Marge Ricketts' death or Kimberly's rape, (2) failed to prove that the custom was intended to result in invidious discrimination against women, and (3) failed to identify the final policymaker who had knowledge of the discriminatory custom. The plaintiffs appeal the district court's grant of judgment as a matter of law.

## II. Discussion

"In reviewing the district court's grant of JAML [judgment as a matter of law], we apply the same standard that governed the district court." *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1263 (8th Cir.1994). Considering the evidence in the light most favorable to the nonmovant, judgment as a matter of law is not appropriate "unless all the evidence points one way and is susceptible of no reasonable inferences sustaining [the nonmovant's] position." *Id.*

Section 1983 provides a cause of action against any "person who, under color of any statute, ordinance, regulation, custom,

or usage, of any State" causes the deprivation of a right protected by federal law or the United States Constitution. 42 U.S.C. § 1983. A municipality may be held liable as a "person" under § 1983. *Monell v. New York City Dep't of Social Serv.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1977). A municipality is not constitutionally required "to protect an individual against private violence," but a municipality may not operate under a custom in which it "selectively den[ies] its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney v. Winnebago County Dep't of Social Serv.*, 489 U.S. 189, 197 & n. 3, 109 S.Ct. 998, 1004 & n. 3, 103 L.Ed.2d 249 (1989).

Whether a municipality discriminates against women by failing to treat complaints of domestic abuse as seriously as complaints of nondomestic abuse is a question of first impression in this circuit. Three other circuits, however, are not unfamiliar with the issue. *See McKee v. City of Rockwall*, 877 F.2d 409, 413 (5th Cir.1989) (denying interlocutory appeal to the city for lack of jurisdiction, but addressing this equal protection issue with regard to the officers' claims of immunity), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 727, 107 L.Ed.2d 746 (1990); *Hynson v. City of Chester*, 864 F.2d 1026, 1032–33 (3d Cir.1988) (remanding this equal protection issue for consideration of the standard enunciated therein); *Watson v. City of Kansas City*, 857 F.2d 690, 696 (10th Cir.1988) (affirming the grant of summary judgment in favor of the city on the plaintiff's gender discrimination claim). The following standard emerges from these cases:

> In order to survive summary judgment, a plaintiff must proffer sufficient evidence that would allow a reasonable jury to infer that it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, that discrimination against women was a motivating factor, and that the plaintiff was injured by the policy or custom.

*Hynson*, 864 F.2d at 1031 (footnote omitted) (citing *Watson*, 857 F.2d at 694).

We believe that this standard adequately sets forth the basic elements of proof under the framework of § 1983 because it requires the plaintiff to prove: (1) a constitutional violation—that the municipality has a custom of providing less protection to victims of domestic abuse with an intent to discriminate against women on the basis of their gender, and (2) that the constitutional violation was caused by a person acting under color of state law—that the unconstitutional municipal custom caused the plaintiffs' injuries. We begin our analysis of the case at hand with the causation requirement.

## A. Causation

■ Assuming the existence of an unconstitutional municipal custom, a § 1983 claimant cannot recover unless the claimant also proves that the custom caused the resulting injury. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2037. "[I]t is when execution of a government's policy or custom ... *inflicts* the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037 (emphasis added). "Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1202, 103 L.Ed.2d 412 (1989). "[U]nder Missouri law of proximate causation, to which we may look in applying § 1983, it is enough that the defendant's fault was a 'substantial factor' in producing the plaintiff's injuries, and the defendant's fault need not have been the *sole* proximate cause in order to allow recovery." *Trudeau v. Wyrick*, 713 F.2d 1360, 1367 (8th Cir.1983). Thus, the relevant inquiry for determining causation is as follows: "Would the injury have been avoided had" there not been a municipal custom of treating domestic abuse less seriously than nondomestic abuse? *Canton*, 489 U.S. at 391, 109 S.Ct. at 1206.

■ Causation is generally a jury question unless, in a particular case, the question is "so free from doubt as to justify taking it from the jury." *Trudeau*, 713 F.2d at 1366–67. "As long as the causal link is not too

tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon,* 915 F.2d 845, 851 (3d Cir.1990).

■ In the case at hand, to find that the injuries caused by Sonny's violent acts of sexual assault and murder would have been avoided had Sonny been arrested for the prior harassment would be an exercise in pure speculation. Such speculation cannot establish causation because it is equally plausible that an arrest for the prior harassment might as easily have spawned retaliatory violence from Sonny. Holding that an officer's failure to arrest for one incident of harassment *causes* a subsequent incident of harassment or violence would essentially take away the officer's discretion to determine when to arrest—a fundamental part of our criminal system. *See McCleskey v. Kemp,* 481 U.S. 279, 297, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987) ("discretion is essential to the criminal justice process"). This in turn "would open municipalities to unprecedented liability under § 1983." *Canton,* 489 U.S. at 391, 109 S.Ct. at 1206. A municipality which, in order to protect itself against the kind of claim brought by the plaintiffs here, directed its officers to arrest every person against whom an allegation of spousal abuse was made would undoubtedly find itself facing Section 1983 claims of unconstitutional arrest without probable cause.

Additionally, the prior reported incidents of harassment here were too remote in time to constitute a proximate cause of the violent attack on April 7, 1987. The September 1986 shotgun incident occurred seven months before the April 7 incident, and no similar episodes occurred during the intervening period. The decisions not to arrest Sonny for the incidents of verbal harassment reported in late March and early April 1987 were closer in time but not so closely connected to or related to the April 7 attacks as to constitute a proximate cause of the attacks. There is no evidence that the police were called on April 7 and failed to respond. The evidence shows that the police were not called until after the violence occurred on April 7, so

there was no realistic opportunity for the police to provide protection on that occasion.

The only causal link that might logically exist is a tenuous connection between the prior harassment, for which no arrests were made, and Sonny's continued harassment. There is no question that Sonny harassed Kimberly while the two protection orders were in effect and that this constituted a violation of the protection orders for which Sonny was not arrested. While arrest or additional attention from the police *might* have dissuaded Sonny from continuing to harass Kimberly, *see Bielevicz,* 915 F.2d at 851 ("it is logical to assume that continued official tolerance of repeated misconduct facilitates similar unlawful actions in the future") (citing *Brandon v. Holt,* 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)), there is no evidence that a prior arrest for harassment would have prevented Sonny's unforeseen violent criminal acts on April 7, 1987. The violent acts were not foreseeable to the police because no similar acts had been reported. We conclude that a reasonable jury could not have found that the police custom of disparate treatment, if it existed, was a substantial factor in producing Kimberly's rape or Mrs. Ricketts' murder.

### B. Constitutional Violation

■ The plaintiffs argue that the district court erred by concluding that they did not set forth a submissible case on the issue of gender discrimination. Upon analysis, we agree with the district court.

■ Under the standard set forth in *Hynson* and *Watson,* an equal protection claim arises upon a showing that "it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence, [and] that discrimination against women was a motivating factor" behind this policy or custom. *Hynson,* 864 F.2d at 1031; *see also Watson,* 857 F.2d at 694. We agree that if discrimination against women were the purpose behind a municipal custom of providing less protection for victims of domestic abuse, then an equal protection claim would arise. In this case, the plaintiffs demonstrated a pattern of fewer arrests in cases of domestic violence, but

the plaintiffs failed to produce evidence from which a reasonable jury could determine that this pattern proved a policy which was motivated by an intent to discriminate against women.

When a widespread custom of a municipality impacts disproportionately on one gender, an equal protection violation arises "only if that impact can be traced to a discriminatory purpose." *Personnel Admin. of Mass. v. Feeney*, 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The disproportionate impact is only relevant to the extent that it "reflects a discriminatory purpose." *Washington v. Davis*, 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). A discriminatory purpose is more than a mere "awareness of the consequences." *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296. The law or custom must be found to have been implemented "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.*

When a municipal custom employs a facially neutral classification and its disproportionate impact on one gender is not susceptible to a neutral explanation, "impact itself would signal that the real classification made by the law was in fact not neutral." *Feeney*, 442 U.S. at 275, 99 S.Ct. at 2294. However, in only a few cases, where a facially neutral policy impacted exclusively against one suspect class and that impact was unexplainable on neutral grounds, has the impact alone signalled a discriminatory purpose. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). When there is a rational, neutral explanation for the adverse impact and the law or custom disadvantages both men and women, then an inference of discriminatory purpose is not permitted. *See Feeney*, 442 U.S. at 275, 99 S.Ct. at 2294.

[W]hen the adverse consequences of a law [or custom] upon an identifiable group are as inevitable as the gender-based consequences ... a strong inference that the adverse effects were desired can reasonably be drawn. But in this inquiry—made as it is under the Constitution—an inference is a working tool, not a synonym for proof. When, as here, the impact is essentially an unavoidable consequence of a [legitimate neutral policy or custom] the inference simply fails to ripen into proof.

*Id.* at 279 n. 25, 99 S.Ct. at 2296 n. 25. In sum, when determining whether there is a showing of discriminatory intent, disproportionate impact is but one factor to consider along with the inferences that rationally may be drawn from the totality of the other relevant facts. *See Davis*, 426 U.S. at 241, 96 S.Ct. at 2048.

The plaintiffs offered the expert testimony of Dr. Eve Buzawa who had gathered statistics indicating that the Columbia police department makes fewer arrests in domestic abuse cases than in nondomestic cases. Dr. Buzawa's opinion was based upon assault reports from portions of the previous year. Dr. Buzawa testified that the custom of disparate treatment for victims of domestic abuse adversely impacts women to a greater extent than men because over 90% of the victims of domestic abuse are women. The disproportionate impact is not exclusively suffered by women, however, because the classification itself is facially neutral and includes male victims of domestic abuse. There is no evidence that male victims of domestic abuse are treated differently than female victims of domestic abuse.[2]

We must discern whether there is a rational explanation for the disparate impact on women. Because of the inherent differences between domestic disputes and nondomestic disputes, legitimately different factors may affect a police officer's decision to arrest or not to arrest in any given situation. Dr. Buzawa's statistics took into account some of

---

**2.** The Equal Protection Clause requires the government to treat similarly situated persons similarly, and dissimilar treatment of those not similarly situated does not result in an equal protection violation. *Klinger v. Dep't of Corrections*, 31 F.3d 727, at 731 (8th Cir.1994) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S.

432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)). A more accurate indicator of an intent to discriminate in this type of case would be a comparison of the arrest rate when men are victims of domestic abuse with the arrest rate when women are the victims. No such comparison was made in this case.

**782**

the variables that affect a decision to arrest in domestic disputes, but we believe that not all of the differences that enter into the discretionary decision of whether to arrest [3] can be properly assessed and quantified through statistics. *See Watson,* 857 F.2d at 695 ("Whether or not probable cause exists is not susceptible to statistical quantification"). Police "discretion is essential to the criminal justice process." *McCleskey,* 481 U.S. at 297, 107 S.Ct. at 1769. "Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious." *Id.* at 313, 107 S.Ct. at 1778.

Because the statistical disparity alone does not signal an intent to discriminate against women, we look to whether the plaintiffs submitted any other evidence of a discriminatory intent. The plaintiffs introduced hearsay statements from members of the Ricketts family, but this evidence is insufficient. Kimberly's sister-in-law testified to statements allegedly made by a police officer to the effect that one man accused of domestic abuse should have been arrested before but was not. Kimberly's father testified that he heard that one officer had been instructed not to arrest Sonny because Kimberly had gone back to him before and probably would again. (Trial Tr. at 1289–91.) These statements are unreliable hearsay. More importantly, while they might offer support for a discriminatory intent toward domestic disputes, they do not evidence an intent to discriminate against women.

The plaintiffs also offered evidence of a historic tolerance of domestic abuse in society and of one fairly recent newspaper statement. A Columbia officer was quoted as blaming a woman victim of domestic abuse for bringing on the assault herself. The officer explained that the context of the statement related only to one particular case where he had seen that happen. (Trial Tr. at 1238–40.) These were the only factors directly bearing on gender discrimination, and they do not combine to create a submissible inference of a discriminatory animus toward women by the Columbia police department.

Although we are sympathetic to the plaintiffs and we acknowledge that they have suffered greatly from the criminal acts of Sonny Stephens, we conclude that the plaintiffs have failed to present evidence of an equal protection violation on the basis of gender.

Having disposed of the case on the basis of lack of causation and lack of a constitutional deprivation, we find it unnecessary to reach the plaintiffs' claim that the district court erred by requiring them to identify a final policymaker of the municipality.

### III. Conclusion

We conclude that from the evidence submitted by the plaintiffs, no reasonable juror could find that the plaintiffs were injured as a result of a widespread custom of the City which was intended to discriminate against women. Thus, the district court did not err in granting the City's renewed motion for judgment as a matter of law, and we affirm the judgment of the district court.

---

**3.** We note that there was no mandatory arrest law governing the decision to arrest in a domestic abuse situation in Missouri at the time of the incidents involved in this case.