# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2861

_____

Sylvia Avalos, Mother and next friend
of Nicholas Vasquez, a minor and
incapacitated person; Nicholas
Vasquez; Miguel "Michael" Vasquez,

        Plaintiffs/Appellees,

        v.

City of Glenwood; City of Council
Bluffs, IA; Mills County, IA; Harrison
County, IA; Pottawattamie County, IA,

        Defendants/Appellants,

Municipality A, Agency A; Agency B,

        Defendant,

Southwest Iowa Multijurisdictional
Drug Task Force,

        Defendant/Appellant,

Unknown/Unnamed Defendants, Sued
as John Doe I, John Doe II, John
Doe III, John Doe IV and Jane Doe;

        Defendants,

Appeal from the United States
District Court for the Southern
District of Iowa.

Gerald Wake, also known as Bo Wake,   *

               Defendant/Appellant,   *

Dirk Lincoln,   *

               Defendant.   *

_____

Submitted: April 13, 2004
Filed: September 2, 2004

_____

Before MORRIS SHEPPARD ARNOLD, RILEY, and COLLOTON, Circuit Judges.

_____

RILEY, Circuit Judge.

Detective Gerald Wake (Detective Wake) and several municipal defendants appeal the district court's denial of their motions for summary judgment based on qualified immunity to Detective Wake, and on the merits of the plaintiffs' substantive due process claims against the municipal defendants. Concluding Detective Wake is entitled to qualified immunity and the municipal defendants are entitled to summary judgment, we reverse.

## I.    BACKGROUND

During the summer of 2000, sixteen-year-old Jessica Whetsel (Jessica) had a relationship with eighteen-year-old Michael Vasquez (Michael). Jessica told Michael her stepfather, Karl Voll (Karl), was likely to "do something to him" if Michael "hurt" her. Michael eventually ended the relationship.

On April 5, 2001, Glenwood High School officials caught Jessica with small plastic bags containing a red substance. Believing the substance to be drugs, school

-2-

officials called the Glenwood Police, and Captain Dirk Lincoln (Captain Lincoln) went to the school. School officials also called Jessica's mother, Maria Voll (Maria), to the school. Jessica told Captain Lincoln the substance was opium, but she would not divulge the source. After Maria stated she would not answer questions until Karl arrived, Jessica and Maria drove to the Glenwood Police Department to wait for Karl.

Pursuant to Glenwood Police Department practice, Captain Lincoln called the Southwest Iowa Multijurisdictional Drug Task Force (Task Force) because of the suspicion drugs were involved. Detective Wake, a Council Bluffs police officer and Task Force member, took the call. Detective Wake and Detective Robert Daley (Detective Daley) of the Pottawattamie County Sheriff's Department, another Task Force member, traveled to Glenwood to investigate.

Karl arrived before the Task Force officers. Captain Lincoln advised Karl of the situation, and Karl asked to see the substance found on Jessica. Captain Lincoln told Karl it had tested slightly positive for heroin. Karl became very upset. When alone with Maria and Jessica, Karl asked Jessica about the substance. Jessica said it was opium and that she got it from Michael and Nicholas Vasquez (Nicholas). Michael and Nicholas are brothers.

After Captain Lincoln reentered the room, Karl asked him what charges Jessica would face. Captain Lincoln stated Jessica could be charged with possessing a controlled substance with intent to deliver and trafficking. Noting the Task Force members would arrive shortly, Captain Lincoln told Karl it would be in his family's best interest to talk to the Task Force members who could "make things disappear." The Task Force members arrived and tested the substance, which again tested slightly positive for heroin.

The Task Force members then put pressure on Jessica in an effort to learn the source of the drugs. Detective Daley informed Jessica of the seriousness of the

situation and that Jessica could face an automatic sentence of twenty-five years. Detective Wake then analogized the situation to a methamphetamine transaction, telling Jessica a person could get a forty-year sentence for selling methamphetamine, but the sentence could be as high as eighty years if the offense were committed on school property. Despite the statements of Detective Daley and Detective Wake, in Karl's post-arrest statement to police, he questioned whether he could have "comped an attorney" and "at the utmost got [Jessica] probation" for the offense.

The Task Force members told the family they wanted to know the source of the substance, and the Volls again asked to speak privately with Jessica. Jessica said she obtained the substance from Nicholas. Jessica told Maria and Karl she had agreed to pay for the substance and to sell some of it at school. Karl and Maria gave this information to the officers, who asked if the Volls would assist in a police investigation. Karl hesitated until Maria told him a white powdery substance Karl had concluded was a cleaning product had been sold to Jessica by the Vasquez brothers, who had told Jessica the substance was a drug. Karl was then willing to help the police. Karl suggested he go to the Vasquez home to try to buy drugs. At some point during the interview, Karl also said he wanted to "kick the shit out of those boys and take matters into his own hands." Detective Daley responded, "maybe in a perfect world, you could get away with it. But we're here. Let us take care of it." Some officers chuckled in response to Karl's statements, and one officer said, "sounds like a good idea to me," but the officers then told Karl, at length, they did not want him involved in the investigation or the proposed transaction with the Vasquezes.

The officers decided to use Maria rather than Karl, because she was more calm and because of their concern Karl would make threats and taint the investigation. In exchange for Jessica not being charged with possession of a controlled substance, Maria agreed to be a confidential informant (CI). The officers fitted Maria with a recording device (wire) and gave her two hundred dollars cash to pay the Vasquezes

what Jessica owed. Detective Daley stated he wished the officers could just turn Karl loose to take care of the situation. Detective Wake laughed at the suggestion. Karl, who was anxious and angry, responded "give me five minutes, follow me after five minutes, and we'll call it a day." Detective Daley told Karl the officers could not do that, that they would not use Karl, and that Karl should not get involved. The officers processed Maria as a CI. They did not conduct a background check on Karl, because he was not going to be used as a CI. After Karl calmed down, the officers agreed to allow Karl to drive Maria to the Vasquez apartment. The officers specifically told Karl to stay in the car.

When Karl and Maria arrived at the Vasquez apartment, against the officers' instructions, Karl went to the door with Maria. Karl made two tape-recorded threats to Michael, Nicholas, and Jeremy Hogan (Hogan), a brother of the Vasquezes, including a threat that he "will kill something" if they give Jessica "anything other than to cop a buzz," and made another tape-recorded threat, outside the Vasquez brothers' presence, to kill someone. Karl did not strike or harm Nicholas or Michael. After the transaction, Detective Wake rebuked Karl for going to the door against the officers' directions. Karl apologized.

Following the encounter, Michael, Nicholas, and Hogan were arrested. Nicholas possessed pre-serialized currency and a small rock of the same substance Jessica had earlier claimed was opium. Michael and Nicholas were charged with conspiracy to distribute a controlled substance or simulated controlled substance. Sylvia Avalos (Avalos), Michael's and Nicholas's mother, paid $500 to bail Nicholas out of jail about two weeks later. Hogan testified his brothers were scared, and Michael and Hogan claimed they told the officers they were afraid of Karl. Neither Michael, Nicholas, nor Hogan ever lodged a written complaint against Karl.

After Michael, Nicholas, and Hogan were arrested, Jessica no longer lived with the Volls. Jessica was placed in a juvenile facility, then ran away from the facility,

and was later expelled from school. Rumors circulated that the Vasquezes threatened to kidnap Jessica and physically harm her. Michael told Jessica he did not care about what had happened, and the Volls "were going to get what was coming to them through the cops." Jessica informed the Volls of these statements.

Maria and Karl called Detective Wake a few weeks after April 5, 2001. The Volls were concerned because Jessica had run away. Karl thought Jessica was still seeing the Vasquezes, and Maria and Karl had heard the Vasquezes planned to kidnap and assault Jessica. Karl ended the conversation by stating guns were not his "thing anymore but if I have to I'll get me one and I will take care of the problem myself." Detective Wake told Karl to stay away from the Vasquezes and discouraged Karl from doing anything on his own. Detective Wake checked with some informants, who had not heard about any threats made by the Vasquezes. Detective Wake also did not think he could arrest Karl and did not think Karl had the means to carry out his threat. Detective Wake had heard other citizens make threats on a routine basis, but rarely did the threats result in action.

On May 11, 2001, the Volls received subpoenas to testify against Michael. The same day, the Volls and Jessica went to a liquor store, where Karl bought a bottle of tequila. After drinking the entire bottle, Karl left for the Vasquez apartment. Karl went to the door and asked for Michael or Nicholas. Nicholas approached the door, and he and Karl spoke in raised voices. Karl said Michael "hurt his baby's heart." Nicholas replied that he did not care about Karl's "baby." Karl told Nicholas he had better care, then shot Nicholas in the head, severely injuring him. Karl was arrested the same day, telling police the Vasquezes had threatened Karl and his family. Later convicted of attempted murder, Karl received a twenty-five year sentence.

Avalos, Michael, and Nicholas filed suit under 42 U.S.C. § 1983, alleging (1) the defendants violated their substantive due process, equal protection, and Fourth Amendment rights; (2) the individual defendants conspired to violate Nicholas's civil

rights; (3) the municipal defendants' practices, omissions, systematic deficiencies, policies and customs encouraged Karl to assault Nicholas and failed to protect him from harm; and (4) the defendants negligently caused Nicholas's injuries. The defendants filed motions for summary judgment on all claims, and the individual defendants asserted qualified immunity on the constitutional claims. The district court granted summary judgment to all defendants on all claims except the substantive due process claims. The district court denied Detective Wake qualified immunity on the substantive due process claims. The district court denied the municipal defendants summary judgment on the substantive due process claims, ruling the Task Force's policies could have caused the violation. The district court dismissed Michael because he was not a party to the first claim.

Detective Wake appeals, arguing the district court erred in denying him qualified immunity, because his actions did not rise to the level of a constitutional violation, and he did not act unreasonably in light of well-settled law. The municipal defendants also appeal, arguing the district court erroneously denied their summary judgment motions because Detective Wake's conduct did not violate a constitutional right, and the district court failed to apply the correct deliberate indifference standard for claims under 42 U.S.C. § 1983.

## II.     DISCUSSION
### A.     Standard of Review

Although the denial of summary judgment is generally an unappealable, nonfinal order, a district court's denial of qualified immunity is immediately appealable under the collateral order doctrine. Hawkins v. Holloway, 316 F.3d 777, 781 (8th Cir. 2003). We review de novo the denial of qualified immunity. Tuggle v. Mangan, 348 F.3d 714, 719 (8th Cir. 2003).

## B.    Qualified Immunity

When performing discretionary functions, government officials generally are shielded from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity 'is an *immunity from suit* rather than a mere defense to liability,' which 'is effectively lost if a case is erroneously permitted to go to trial.'" Tuggle, 348 F.3d at 720 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Qualified immunity is available "to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) (citation omitted).

When analyzing qualified immunity, courts conduct a two-part inquiry. The court must first consider the threshold inquiry of whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the defendants' conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001); Tuggle, 348 F.3d at 720. If a constitutional right has not been violated, it is unnecessary to inquire further regarding qualified immunity. Saucier, 533 U.S. at 201. If a violation could be established on the facts alleged, the second inquiry is whether the right was clearly established at the time the violation occurred. Id.

### 1.    Violation of a Constitutional Right

The plaintiffs claim their clearly established rights were violated when the defendants "increased the potential for harm to them by encouraging, supporting, and condoning the assault of a third party upon them." The plaintiffs also argue the actions were "conscience shocking." Because the issue before us is the district court's denial of qualified immunity, we focus here only on Detective Wake's actions.

States have no general affirmative obligation to protect individuals against private violence. DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). The Due Process Clause of the Fourteenth Amendment "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." Id. at 195. "Its purpose [is] to protect the people from the State, not to ensure that the State protect[s] them from each other." Id. at 196. The "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

However, substantive due process requires a state to protect individuals under two theories. First, the state owes a duty to protect those in its custody. Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (en banc). Second, the state owes a duty to protect individuals if the state created the danger to which the individuals are subjected. Id. The plaintiffs in this case rely on the "state-created danger" theory.

The due process clause's "guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm[,]" County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998), and "does not transform every tort committed by a state actor into a constitutional violation," DeShaney, 489 U.S. at 202. "[T]he test we employ to ascertain a valid substantive due process violation is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Hawkins, 316 F.3d at 780 (quoting Lewis, 523 U.S. at 848 n.8). Under the state-created danger theory, the plaintiffs must prove (1) they were members of a limited, precisely definable group; (2) Detective Wake's conduct put the plaintiffs at significant risk of serious, immediate, and proximate harm; (3) the risk was obvious or known to Detective Wake; (4) Detective Wake acted recklessly in conscious disregard of the risk; and (5) in total, Detective Wake's conduct shocks the conscience. Uhlrig v. Harder, 64 F.3d 567, 574 (10th Cir. 1995). Mere negligence

is not conscience-shocking and cannot support a claim alleging a violation of a plaintiff's substantive due process rights. <u>Terry B. v. Gilkey</u>, 229 F.3d 680, 684 (8th Cir. 2000).

"[I]f the state acts affirmatively to place someone in a position of danger that he or she would not otherwise have faced, the state actor, depending on his or her state of mind, may have committed a constitutional tort." <u>S.S. v. McMullen</u>, 225 F.3d 960, 962 (8th Cir. 2000) (en banc). In <u>DeShaney</u>, the Court observed that the state was not a "permanent guarantor" of the safety of a child removed from custody of an abusive father, but eventually placed back in that father's custody. <u>DeShaney</u>, 489 U.S. at 201. In ruling the state had no constitutional duty to protect the child, the Court noted that, although the state might have been aware of dangers the plaintiff faced, "it played no part in their creation, nor did it do anything to render him any more vulnerable to them." <u>Id.</u>

We conclude the plaintiffs failed to show Detective Wake violated their substantive due process rights. Nothing Detective Wake actually did made the Vasquezes any more vulnerable than they would have been once Karl discovered Jessica's involvement with the Vasquezes and drugs. Detective Wake had no grounds to arrest or restrain Karl, could not have held Nicholas once he posted bond, and did not cause Karl to get drunk and go to the Vasquez apartment more than five weeks after the initial encounter between Karl and the Vasquezes. Detective Wake was essentially a messenger who, as part of his duties, informed Karl about the investigation and used Karl's wife Maria as a CI on one occasion. That Karl acted violently and unpredictably more than five weeks later does not give rise to a substantive due process claim. Further, assuming Detective Wake's actions on April 5, 2001, created some danger to the Vasquezes, Detective Wake's actions did not transform Detective Wake into a "permanent guarantor" of the safety of the Vasquezes until May 11, 2001. As we have observed, "[m]ere knowledge of danger

to the individual does not create an affirmative duty to protect." <u>Carlton v. Cleburne County</u>, 93 F.3d 505, 509 (8th Cir. 1996) (citing <u>DeShaney</u>, 489 U.S. at 200).

Additionally, Detective Wake's actions did not place Nicholas in any greater danger than he otherwise would have faced. Karl's anger and threats were not the result of the officers' statements, but were made "in reference to anyone giving [his] daughter any more drugs to sell for them" and in response to Michael's "hurting [Jessica's] heart." Before Detective Wake arrived, Karl became angry when Captain Lincoln told Karl the substance Jessica possessed tested positive for heroin. Karl was understandably upset, as any concerned parent would be, and the fact he made a threat at the time did not make it obvious or inevitable Karl would harm Nicholas five weeks later. Furthermore, any claim that the officers' deception of Jessica and her family about her possible sentence in any way caused the shooting is baseless because, before the shooting date, the state decided not to prosecute Jessica at all.

Furthermore, Karl's anger was apparently triggered or fueled immediately before the shooting by the breakup between Michael and Jessica. When Karl, intoxicated with tequila, confronted Nicholas on May 11, 2001, the shooting resulted, not from the drug investigation, but when Karl told Nicholas that Michael "hurt his baby's [Jessica's] heart," and Nicholas responded by saying he did not care about Karl's baby's heart. Karl retaliated by stating Nicholas had better care, and then Karl shot Nicholas.

Even assuming Detective Wake had a duty to protect Nicholas from Karl, the plaintiffs cannot demonstrate a substantive due process violation because Detective Wake's actions were not "conscience-shocking." Actionable substantive due process claims involve a "'level of . . . abuse of power' . . . 'so "brutal" and "offensive" that [they do] not comport with traditional ideas of fair play and decency.'" <u>S.S.</u>, 225 F.3d at 964 (citations omitted). The shooting in this case was simply too remote a consequence to constitute a substantive due process violation. Detective Wake's

actions relative to the investigation clearly were neither immediate nor proximate to the shooting. See Dorothy J. v. Little Rock Sch. Dist., 7 F.3d 729, 733 n.4 (8th Cir. 1993) ("In most every circuit court decision imposing § 1983 liability because the State affirmatively created or enhanced a danger, 'the immediate threat of harm has a limited range and duration.'") (citation omitted).

Detective Wake's actions also do not shock the conscience by intentionally or wrongfully disregarding a known danger by failing to conduct a background check on Karl. Detective Wake did not know about Karl's criminal history. However, (1) the officers did not use Karl as a CI; (2) the officers testified they told Karl not to get involved; and (3) Karl and Maria testified the officers told Karl to stay out of the investigation. Thus, Detective Wake's failure to investigate Karl cannot be considered more than negligence. See Terry B., 229 F.3d at 684. Had Detective Wake done the background check on Karl, this would have merely reinforced the decision not to use Karl as a CI. The officers' failure to conduct a background check on a person they did not intend to use as a CI is not conscience-shocking.

To find Detective Wake violated the plaintiffs' substantive due process rights in this case would create a difficult situation for police officers. Requiring officers to act upon every threat they hear could expose the officers to claims of civil liability for false arrest. Ricketts v. City of Columbia, 36 F.3d 775, 780 (8th Cir. 1994). In Ricketts, we observed that to hold an officer's failure to arrest an individual for one incident of harassment which *causes* a subsequent incident of violence would remove a fundamental part of our criminal justice system–an officer's discretion to decide when to arrest. Id. Such a holding "would open up municipalities to unprecedented liability under § 1983." Id. (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)). In this case, no probable cause or other reasonable justification existed for detaining Karl on April 5, 2001, or anytime before the shooting on May 11, 2001.

### 2. Clearly Established Right

Because we conclude Detective Wake did not violate the plaintiffs' substantive due process rights, we need not address the alternative question of whether any substantive due process rights the plaintiffs assert were clearly established at the time of Detective Wake's conduct. See Tuggle, 348 F.3d at 723.

### C. Inextricably Intertwined

The municipal defendants also argue that, because the claims against them are intertwined with our qualified immunity decision, we have jurisdiction to decide whether summary judgment was improperly denied. The municipal defendants also argue the district court failed to apply the correct standard to the claims against the Task Force members. When an interlocutory appeal of a qualified immunity denial is before us, we also have jurisdiction to decide closely related legal issues such as pendent appellate claims. Kincade v. City of Blue Springs, 64 F.3d 389, 394 (8th Cir. 1995). Appeals are permitted from "final decision[s] by which a district court disassociates itself from a case, but also from a small category of decisions that, although they do not end the litigation, must nonetheless be considered 'final.'" Swint v. Chambers County Comm'n, 514 U.S. 35, 42 (1995); 28 U.S.C. § 1291. Pendent claims are considered "inextricably intertwined" with other properly presented claims "only if the pendent claim is coterminous with, or subsumed in, the claim before the court on interlocutory appeal–that is, when the appellate resolution of the collateral appeal necessarily resolves the pendent claim as well." Kincade, 64 F.3d at 394 (citation omitted).[1]

---

[1]We recognize the "inextricably intertwined" doctrine is a judicially created exception to the final order rule. Our case appears to fall closer to Kincade than it does to Veneklase v. City of Fargo, 78 F.3d 1264, 1269-70 (8th Cir. 1996) (finding interlocutory appeal of municipal liability issue not properly before court), because the claims against the municipalities are inextricably intertwined with the qualified immunity issue, as more fully set forth in the body of our opinion.

In denying summary judgment for the municipal defendants, the district court stated the plaintiffs claimed the policies of the Task Force and its members violated Nicholas's constitutional right to substantive due process. The district court then concluded the plaintiffs presented a sufficient claim against the municipal defendants based on the deficiencies of the Task Force policies and procedures. The district court reasoned Karl was as much a CI as Maria because the officers allowed him to accompany her. The Task Force policies at issue here are the rules regarding the use of CIs. The district court examined the Task Force policies regarding "Confidential Informant Management" and noted the policies have "a number of glaring deficiencies" and are insufficient when compared to the United States Attorney General's guidelines and the Association of Chiefs of Police model guidelines regarding use of CIs. The primary inadequacies cited were the municipal defendants have no requirement that officers "seek any form of approval, or give any further thought to sending angry parents as CIs on a drug sting operation while their daughter waited in jail expecting to go to prison for the next eighty years." The district court stated the inadequacies in the Task Force policies are "appalling" and such failings "shock the conscience."

Municipalities are "liable under Section 1983 only if a municipal custom or policy caused the deprivation of the right protected by the constitution or federal laws," Angarita v. St. Louis County, 981 F.2d 1537, 1546 (8th Cir. 1992) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978)), or the "municipal policy or custom was the 'moving force [behind] the constitutional violation,'" Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (quoting Monell, 436 U.S. at 694). For there to be section 1983 liability, "there must first be a violation of the plaintiff's constitutional rights." Shrum ex rel. Kelly v. Kluck, 249 F.3d 773, 777 (8th Cir. 2001) (citation omitted). "[A] municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." Mettler, 165 F.3d at 1204.

-14-

Under this standard, there must be an unconstitutional act by the municipal employee before the municipality is liable.

We conclude our decision on Detective Wake's entitlement to qualified immunity "necessarily resolves" the remaining claims in the municipal defendants' favor. Lockridge v. Bd. of Trs. of the Univ. of Ark., 315 F.3d 1005, 1013 (8th Cir. 2003) (en banc). As discussed in the previous section, we conclude the plaintiffs have failed to establish a violation of their substantive due process rights. Try as they might, the plaintiffs simply have not demonstrated any of the municipal defendants' policies applied to Karl, who was not a CI. Karl, Maria, Detective Wake, and Detective Daley all stated under oath Karl was never enlisted as a CI. Indeed, the Task Force officers specifically and repeatedly instructed Karl not to get involved in the investigation. Regardless of any alleged deficiencies in the Task Force's procedures, they did not apply to Karl. Thus, the plaintiffs are unable to show either (1) a deprivation of a constitutional right or (2) a municipal custom or policy that caused such deprivation. See Angarita, 981 F.2d at 1546.

## III.   CONCLUSION

We reverse the district court's decision denying (1) Detective Wake's summary judgment motion based on qualified immunity, and (2) the municipal defendants' summary judgment motions. We remand for entry of judgment in the defendants' favor.

_____

-15-